Hall, J.
The prisoner has been found guilty of the offence charged in the indictment : whether any, or what punishment, can be inflicted upon him, in consequence thereof, is now to be decided. I will first consider, whether we have any authority to inflict any punishment upon him, from any Act of Assembly.
The legislature in the year 1774, passed an Act, entitled an Act, to prevent the wilful and mali *247 cious killing of slaves ; by which they annexed punishment of one year’s imprisonment to the commission of the first offence ; and have declared that the person upon a second conviction thereof, shall be adjudged guilty of murder, and shall suffer death without benefit of clergy. In the year 1791, another Act was passed, for the purpose of examining this Act. The preamble of which, sec. 3, expresses, " that whereas by another Act of As- " sembly passed in the year 1774, the killing of a “ slave, however wanton &c. is only punishable " in the first instance by imprisonment &c. which " distinction of criminality between the murder of " a white person, and one who is equally a human " creature &c. is disgraceful to humanity &c. be it " enacted &c. that if any person shall hereafter be “ guilty of wilfully and maliciously killing a slave, “ such offender shall upon the first coviction there- " of be adjudged guilty of murder, and shall suf- " fer the same punishment as if he had killed a free “ man.” If we consider that the mildness of the punishment, directed to be inflicted upon the first conviction &c. by the former Act, is what the latter Act in its preamble, sec. 3, complains of, and go no further, our impression at once would be, that we had not only power to inflict a punishment upon the prisoner, but also, a greater one, than was annexed to the offence by the Act of 1774. But the preamble of a statute is no part of it ; 6 Mod. 62. Although it is often proper, to put such construction on a statute, as will agree with the preamble, yet it ought not to be done, when there *248 by, the enacting clause would be confined to it ; 8 Mod. 144.
We must then consider the words of the enacting clause, without regard to the preamble, in case they cannot be reconciled. If any person hereafter shall be guilty of killing a slave &c. such offender shall be adjudged guilty of murder &c. and shall suffer the same punishment, as if he had killed a free man. In case the person had killed a free man what punishment would the law have inflicted upon him ? Before this question can be solved, another must be asked ; because upon that, the solution of the first depends. What fort of a killing was it ? or what circumstances of aggravation or mitigation attended it ? did the act bespeak such depravity of heart, as would stamp it with the name of murder ? or were they such as justified it ? If of the former sort, capital punishment should be inflicted upon the author of it ; if of the latter sort, he is guiltless. That to which the legislature referred us for the purpose of ascertaining the punishment, proper to be inflicted is, in itself, so doubtful and uncertain, that I think no punishment whatever can be inflicted : without using a discretion and indulging a latitude, which in criminal cases, ought never to be allowed a Judge.
It may be thought, that the words “ shall suffer " the same punishment as if he had killed a free " man,” from the connexion in which they stand with the words preceding them in the same clause, viz. “ that if any person shall hereafter be guilty *249 " of wilfully and maliciously killing a slave ” should be allowed to have this meaning, and “ shall suffer “ the same punishment, as if he had wilfully and ma- " liciously killed a free man.” I cannot agree to this construction ; because if is a rule, that penal statutes should be construed strictly ; 1 Bl. Com. 88. Much latitude of construction ought not to be permitted to operate against life : if it operate at all, it should be in favor of it. Punishments ought to be plainly defined and easy to be understood ; they ought not to depend upon construction or arbitrary discretion.
Perhaps the legislature did intend, that those words should convey that meaning ; but it is not certain that such was their intention : if it was, it might have been easily expressed ; and indeed, if it were so expressed, it would not be altogether free from uncertainty. But suppose that to have been their intention, and that intention plainly expressed and free from uncertainty ; is the benefit of clergy taken away ? It is laid down in 2 Hale 330, that where a statute makes a new felony, clergy is incident thereto, unless it be especially taken away by Act of Parliament. This doctrine is recognized by Sir William Blackstone in the fourth book of his commentaries, page 98 ; but I think it unnecessary to consider this part of the case now ; because, for the reasons given, I do not feel myself authorized by the Act of Assembly, to say that any punishment should be inflicted on the prisoner. I will only add, that our legislature seem to have also recognized the doctrine laid down by Ld. Hale, because *250 in the Act of 1774, before spoken of, the benefit of clergy is taken away in express words, upon a second conviction &c ; the same thing is evidenced by many other Acts of Assembly.
II. But it has been also contended, on behalf of the State, that the offence with which the prisoner is charged, is a felony at common law, and that having been found guilty by the jury, he ought to be punished, independently of any Act of Assembly on the subject. This question arises out of the peculiarity of our situation ; slavery not being known to the laws of England, from them we cannot derive our usual information. Sir William Blackstone says, liberty is so deeply implanted in the English Constitution, that the moment a slave lands there, he falls under the protection of the laws, and so far becomes a free man ; though the master’s right to his service may possibly continue ; 1 Bl. Com. 127. From this expression, I understand the author’s meaning to be, that the reason why the laws extend their protection to a slave is, because the moment he lands in England he undergoes a change, his condition is ameliorated, and in contemplation of law, at least, he is no longer a slave, but a free man. If this be the reason, why a slave comes within the protection of the laws of England, it would follow, that if a slave were carried there, and his condition of slavery were not altered, the laws would not extend their protection to him ; because a slave in a pure state of slavery, has no rights. President Montesquieu, in his Spirit of *251 Laws, Vol. I. Book 15. cap. I. and Sir William Blackstone in his Commentaries, Vol, I. 423, define pure slavery to be, that whereby an absolute power is given to the master, over the life and fortune of his slave. In some countries where slavery has existed, laws have been made from time to time, ameliorating its condition ; the power of taking away their lives, or cruelly treating them, has sometimes been restrained : these restraints, we find, were the consequence of positive laws : they did not exist before these laws imposed them ; they were unknown in a pure state of slavery. It is said in Co. Litt. 116, b, that he that was taken in battle, remained bond to his taker forever, and he could do with him as with his beast ; he could kill him with impunity, &c. Afterwards we find it ordained, that the life of a villein was not in the power of his lord ; that he that killed his villein, should have the same punishment as if he had killed a free man. The lord could not maim his villein ; if he did, the King would punish him for maiming his subject ; because he disabled him, so that he could not do the King service ; Co. Litt. 127. a. Villeinage however, as it existed in England, reflects but little light on our subject ; it had, attached to it, certain rights, that were unknown to a pure state of slavery. We have seen, that a villein is called the King’s subject ; that the King had a right to exact services from him ; the lord’s power over him was not absolute : a villein could not sue his lord, but could bring all manner of actions against *252 every other person ; he might have an action of appeal against his lord for the death of his father &c ; Litt. sec. 189 : he might be an executor, and in that capacity sue his lord ; sec. 191.
Slaves in this country, possess no such rights ; their condition is more abject ; 2 Sal. 666 : they are not parties to our Constitution ; it was not made for them. What the powers of a master were over his slave, in this country, prior to the year 1774, have not been defined. I have not heard, that any convictions and capital punishments took place before that period, for killing of negroes. By an Act of Assembly, passed in April, in the year 1741, cap. 24, sec. 54, it is declared that if in the dispersing of any unlawful assemblies of rebel slaves &c., apprehending runaways &c., in correction &c., any slave shall happen to be killed or destroyed &c., the court of the county &c., shall put a valuation upon such slave. In the next succeeding section it is declared, that nothing herein contained, shall be construed, deemed, or taken to defeat or bar the action of any persons, whose slave or slaves shall happen to be killed, by any other person whatsoever, contrary to the directions & c., of this Act ; but all and every owner &c., shall and may bring his, her or their action for recovery of damages, for such slave or slaves so killed. From this part of the Act it appears, that before the Act passed, an action could have been suitained, by the owner of a slave, against any person who killed him ; the sole object of the *253 last section is to fix such a construction on the first, and so to explain it, as that such action shall not be defeated or barred. It does not give the action, which before, would not lie, but guards it from such construction as would tend to narrow its operation. If then, this action could have been sustained, it must have been on the ground, that slaves were considered as chattels. Killing a person may amount to felony or not, as the circumstances of the case may be, that attend it. I understand that this action was sustainable in all cases of a killing of slaves, except in the cases provided for in the 54th. sec. If the killing of a slave, should be considered a felony at common law, in case it was done under the same circumstances of aggravation, as in the case of a freeman, would amount to felony ; what would be the result ? the person offending, would be answerable, both civiliter and criminaliter. The trespass, or civil injury, would not be extinguished in the felony ; but it would depend upon accident, whether a recovery could be effected or not. If the indictment should be first tried, and the prisoner found guilty and executed, the action would be at an end ; actio personalis moritur cum persona, and I take that to be such an action as the maxim would bear upon. These are consequences, I cannot be led to believe the legislature intended to give rise to : that they did not, may be further ascertained, from the Act passed in the year 1774, before mentioned ; where it is mentioned, that if any person shall be *254 guilty of wilfully and maliciously killing a slave &c. such offender shall suffer twelve months imprisonment, and upon a second conviction, shall be adjudged guilty of murder, and shall suffer death without benefit of clergy ; in 3 sec. it is further declared, that such offender shall on the first conviction thereof, pay the owner such sum as shall be the value of such slave : it is not expressed what compensation shall be made to the owner, upon a second conviction, when the offender is to suffer death ; nor does the Act of 1791 direct that compensation shall be made to the owner, by the offender. So that, it does not appear that the legislature had an idea, that the offender should suffer death, and also make compensation to the owner of the slave ; which we have seen, would have been the case, if the killing of a slave had been felony at common law.
The Act passed in the year 1774, is entitled an act to prevent the wilful and malicious killing of slaves. If it was a felony at common law to do so, the punishment due to it, was greater than that inflicted by this Act. I admit that nothing decisive of the question, is to be collected from the preamble, which expresses that doubts existed as to the punishment proper to be inflicted ; it is true the legislature might have thought that the punishment of death for the first offence, was too severe, and therefore not proper to be inflicted ; and in lieu of it, have substituted one year’s imprisonment.
*255 The legislature declare, in the Act passed in the year 1791, sec. 3, that the punishment inflicted by the Act passed in the year 1774, is too mild ; and no doubt they intended, for the first offence, to inflict the punishment of death upon the first conviction : if so, and it was a felony at common law to kill a slave, under any circumstances which, in the case of a free man, would amount to felony, would not the same end have been answered by repealing the Act of 1774, and leaving the offence to be punished at common law, instead of passing an act, intended to speak the same language and to inflict the same punishment, as was spoken and inflicted by the common law ?
I have taken this view of the Acts of Assembly, to ascertain, as well as I could, the opinion entertained by the legislature on the latter question. From the consideration which I have given the whole case, if I even felt disposed to act the most rigid part towards the prisoner, the most I could say, and the greatest length I could go, would be, that it is doubtful whether the offence with which he is charged is a felony at common law or not. If it is doubtful whether he ought to be punished or not, that, certainly, is a sufficient reason for discharging him ; crimes and punishments ought to be ascertained with certainty. Feeling, however, as I do, but little doubt, I cannot hesitate to say, that he ought to be discharged.
*256 Johnston, J.
The murder of a slave, appears to me, a crime of the most atrocious and barbarous nature ; much more so, than killing a person who is free, and on an equal footing. It is an evidence of a most depraved, and cruel disposition, to murder one, so much in your power, that he is incapable of making resistance, even in his own defence ; and if at any time, his conduct becomes so obnoxious, that it cannot be longer borne by his master, he has it in his power to dispose of him and remove him to any distance he thinks proper. It is unnecessary to consider, what punishment was annexed to the murder of slaves in other countries either in antient or modern times ; the definition of murder, as laid down in our books, applies as forcibly to the murder of a slave as to the murder of a freeman ; and had there been nothing in our Acts of Assembly, I should not hesitate on this occasion to have pronounced sentence of death on the prisoner.
But the Act of 1791, chap. 4, sect. 3, after enacting “ that if any person hereafter be guilty of wilfully and maliciously killing a slave, such offender shall, upon the first conviction thereof, be adjudged guilty of “Murder ;" had the act of assembly stopped here, there could have been no doubt in the present case ; but, when it goes on further to assign the punishment, it enacts in these words— “ and shall suffer the same punishment, as if he had “ killed a freeman”. The killing of a freeman is punished in different ways, and in some cases no pun *257 ishment is annexed to it ; as where a man kills another by accident, or as it is expressed in our books per infortunium ; or where a man kills another in his own defence. From the context, and taking every part of the section under consideration, there remains no doubt in my mind, respecting the intention of the legislature ; but the judges in this country as well as in England, have laid down, and invariably adhered to, very strict rules in the construction of penal statutes, in favor of life ; such as, that the words should be taken in mitiori sensu, where they are doubtful, or will admit of various constructions ; and that nothing shall be taken by construction, implication, or reference, from the context.
Under these considerations ; under the influence of the decisions of the most respectable judges as reported in all the books which treat of the criminal law, though not without a considerable degree of reluctance, I am of opinion, that the judgment in this case should be arrested.
Taylor, J.
I cannot yield my assent to the position, that a new felony is created by the Act of 1791, or that any offence is created, which did not antecedently exist. For the killing of a slave, if accompanied with those circumstances which constitute murder, amounts to that crime, in my judgment, as much as the killing of a free man.
What is the definition of murder ? The unlawful killing of a reasonable creature within the *258 peace of the state, with malice aforethought. A slave is a reasonable creature ; may be within the peace ; and is under the protection of the state ; and may become the victim of pre-conceived malice. Upon what foundation, can the claim of a master to an absolute dominion over the life of his slave, be rested ? The authority for it, is not to be found in the law of nature, for that will authorize a man to take away the life of another, only from the unavoidable necessity of saving his own ; and of this code, the cardinal duty is, to abstain from injury, and do all the good we can. It is not the necessary consequence of the state of slavery, for that may exist without it ; and its natural inconveniences ought not to be aggravated by an evil at which reason, religion, humanity and policy equally revolt. Policy may occasionally dictate the propriety of enhancing or mitigating the punishment ; may at one time subject the offender to a year’s imprisonment, and at another to death ; yet amidst all these mutations the crime is unchanged in its essence, undiminished in its enormity. The scale of its guilt exists in those relations of things, which are prior to human institutions, and whose sanctions must forever remain unimpaired.*
*259 It cannot be distinctly inferred, from the Act of 1774, that the legislature of that period doubted, whether this amounted to murder at common law ; they do indeed state, in the preamble of that Act, that some doubts have arisen, with respect to the punishment proper to be inflicted upon those guilty of the offence ; but such doubts resulting from considerations of a political nature, may very well consist with an entire conviction, that the crime is murder at common law. Doubtless, they may ordain what ever punishment they think fit for every crime ; they may at one time deem imprisonment sufficiently severe to repress the crime of killing a slave : when perhaps a different state of things may at another period suggest the necessity of an increased severity. But their adopting the lighter punishment, does not imply, that before the time of adoption, the act was without guilt. To pursue the argument in its consequences, it will follow, that from the first settlement of this state until the year 1774, no Act of the legislature having passed upon this subject, the crime of killing a slave with malice, was not punishable as homicide. The contrary conclusion appears to me most just ; namely that the crime was comprehended under the common law definition of murder, which the statutes of 23 Hen. 8 and 1 Ed. 6, deprived of clergy ; that it never ceased to be so considered: but, in 1774, the legis *260 lature thought proper to mitigate the punishment of the first offence, from death, to imprisonment ; reserving the common law punishment of death to the second conviction. So it remained until 1791, when the legislature aimed to restore the former punishment, by the Act upon which this prisoner is indicted. The principle relied on is quite correct, that whenever an offence is made felony by statute, it shall have the benefit of clergy, unless it be expresly excluded from it ; and in all felonies clergy is allowable, unless taken away by statute ; but the Act of 1791 repealing that of 1774, necessarily revived the operation of those statutes by which murder is deprived of clergy, and if this Act had been a simple repeal, or sufficiently explicit in other respects, judgment of death must have been pronounced against the prisoner. But when the Court is called upon, under an Act of Assembly, to pronounce the highest punishment known to the law, they must he satisfied that the language used is clear and explicit to the object intended. For if it admits of two constructions, that must be adopted which is favorable to the prisoner. On this ground therefore and the reasons given by the rest of the Court, I think no judgment can be pronounced.
Macay, J.
This indictment is grounded on the 3 sec. of the Act of the General Assembly, passed in 1791, entitled an Act to amend an Act, entitled an Act to prevent thefts and robberies by slaves, free negroes and mulattoes, passed in 1787, and to *261 amend an Act, passed in 1774, entitled an Act to prevent the wilful and malicious killing of slaves.
The third section enacts that if any person shall hereafter be guilty of wilfully and maliciouly killing a slave, such offender shall, upon the first conviction thereof, be adjudged guilty of murder, and shall suffer the same punishment as if he had killed a freeman, any law, or usage to the contrary notwithstanding.
Homicide, under the laws of this State, is divided into three classes, I. Murder, which is punishable with death and always attended with malice, express or implied ; II. Manslaughter, which is done on a sudden provocation, un-accompanied with malice, for this offence the offender is entitled to his clergy : III. Simple Homicide which is either justifiable or excusable, and for which the law of this State has inflicted no kind of punishment : the person charged being deemed unfortunate and not criminal. This is an offence first legislated upon by the Act of 1774, and finally by this Act of the General Assembly, of 1791, which has not affixed either the punishment of murder or manslaughter to it, but that of killing a freeman. The killing of a freeman under such circumstances as amounts neither to murder or manslaughter, is no crime ; no punishment can be inflicted ; the person charged is to be acquitted and discharged on his payment of costs. Therefore judgment must be stayed and the prisoner discharged.
Judgment arrested.

 According to Judge Blackstone, the principal efficacy of human laws consists in restraining the conduct of men, as to in-indifferent points; but, he adds, “ with regard to such points as " are not indifferent, human laws are only declaratory of, and " act in subordination to, the divine and natural law. To in- " stance in the case of murder: this is expressly forbidden by the " divine and demonstrably by the natural law: and from these *259 " prohibitions arises the true unlawfulness of this crime. Those “ human laws, that annex a punishment to it, do not at all en- " crease it's moral guilt, or superadd any fresh obligations in fo- " ro conscience to abstain from it's perpetration." 1 Com. 43.